**CLOVERPORT SAND & GRAVEL CO., INC.**

v.

**The UNITED STATES.**

No. 344–77.

United States Claims Court.

Aug. 7, 1984.

Donald F. Mintmire, Louisville, Ky., for plaintiff. John E. Evans, Louisville, Ky., of counsel.

Sylvia Sepulveda-Hambor, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht, II, Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

The plaintiff in this inverse condemnation action is the owner of a parcel of approximately 34 acres of land situated adjacent to the Ohio River on the western outskirts of the City of Cloverport in Breckinridge County, Kentucky. The plaintiff has been involved in the extraction and marketing of sand and gravel from this land since it acquired the property in 1962. In this action, the plaintiff seeks to recover compensation for diminution in the value of its property caused by actions of the defendant. Specifically, the plaintiff claims that the United States Army Corps of Engineers caused a permanent rise of 25 feet in the level of the Ohio River adjacent to the plaintiff's property in September of 1971 by building a new dam. As a result, the water table underlying the property rose to a corresponding level, diminishing the value of the property.

A trial on the issue of damages was held in Louisville, Kentucky, after the liability of the defendant had been stipulated to by the parties. On the basis of the entire record in this case, the Court has concluded that the plaintiff's property was diminished in value in the total amount of $9,190, and the plaintiff is entitled to recover that amount, together with interest from the date of the taking.

### Facts

The plaintiff, Cloverport Sand and Gravel Co., Inc., is a corporation engaged in mining and marketing sand and gravel from a tract of land located at the western edge of the City of Cloverport in Breckinridge County, Kentucky. The subject property is an elongated rectangular strip of approximately 34 acres of land running roughly east and west and lying south of the Ohio River. Approximately half of the northern boundary abuts a strip of land owned by a third party which separates plaintiff's land from the river. The eastern half of the northern boundary lies adjacent to and opens into the river. To the south, the property borders land owned by the Louisville and Nashville Railroad and by the City of Cloverport. Property abutting the eastern border of plaintiff's property also is owned by the city and is the site of a trailer

park. The western edge of the property is bordered by property owned by third parties not involved in this action.

The plaintiff's property is relatively flat, and lies at an average elevation of from 410 feet mean sea level (msl) to 420 feet msl. Overlying the property is a layer of overburden—unmarketable soil, dirt and clay—which must be removed before sand and gravel may be extracted. The depth of the overburden varies from six to eight feet and, in some areas of the property, extends to a depth of ten feet. Beneath the overburden lies a substantial deposit of sand and gravel. Lying at approximately 358 feet msl is a dense layer of unmarketable aggregate known as hardpan. This layer is from four to six inches thick and is composed of compacted sand, gravel and blue clay.

The subject property is part of a larger tract of 36.25 acres which was formed by the consolidation in 1962 of two smaller parcels consisting of 32 and 4.25 acres. Mr. Silas B. Wright, now the plaintiff corporation's president, and Mr. Wathen Tobin, now deceased, purchased the two tracts in their own names in 1962. At that time, the two men were partners in a crushed rock and asphalt paving business known as the White Stone Company. Prior to their purchase of the parcels, Mr. Wright and Mr. Tobin had become aware that the 32 acre parcel was the site of an ongoing sand and gravel mining operation conducted by Mr. Hubert Bruce. Believing that a sand mining operation would complement their rock and paving business, Mr. Wright and Mr. Tobin purchased Mr. Bruce's business and land, together with the adjoining 4.25 acre parcel.

Thereafter, the two men formed the plaintiff corporation for the purpose of owning and operating the property as a sand and gravel pit, and marketing the sand and gravel extracted from the property. After forming Cloverport and purchasing the two tracts of land, Mr. Wright and Mr. Tobin transferred the land to Cloverport by a deed dated May 15, 1962.

When Mr. Wright and Mr. Tobin acquired the property in 1962, Mr. Bruce had disturbed approximately three to four acres, although he had not mined this area to exhaustion. As a result, there existed in the eastern portion of the property a water-filled pit separated from the river by a strip of land, characterized by the plaintiff as a levee, composed of the same materials as the rest of the property. Although the levee was basically a natural structure, Mr. Bruce, and later Mr. Wright, added to it occasionally by dumping on it overburden and other unmarketable material extracted from other parts of the property. In 1962, the levee was approximately 200 yards long, 100 yards wide at its base and 30 to 40 yards wide at its top. However, by May 1972, the levee had been reduced to an approximate width of 15 feet at the top due to the mining activity in the pit.

Due to the porous nature of the sand and gravel deposits underlying the plaintiff's land, the level of the water table beneath the property corresponded with that of the Ohio River. Although the levee separated the pit from the river, any part of the pit which extended below the minimum level of the river was beneath water at all times. In the event of a rise in the level of the river, the water in the pit would rise to a corresponding level. Changes in the water level of the river were not reflected in the plaintiff's pit immediately, however, due to the presence of the levee, which acted as a buffer, causing the water in the pit to rise or fall gradually over a period of 36 to 48 hours.

Between 1962 and May 1972, Cloverport mined its property with a dragline crane. The dragline was placed at or near water level at various places around the perimeter of the pit. To extract sand and gravel from the pit, the operator (usually Mr. Wright) would swing the boom, throwing the bucket out over the pit toward the opposite bank. Wave action created when the bucket hit the water undercut the bank, causing it to collapse into the pit. When the operator retrieved the bucket, the bucket would fill as it dragged across the floor of the pit. The contents of the bucket were

then deposited in a hopper or some other repository or, at times, were placed into a truck which would transfer it to the plaintiff's processing plant for washing and classifying.

Cloverport maintained its processing plant approximately five feet above the water level. The plant was operated by electric motors located approximately ten feet above the processing machinery. Whenever it became apparent that the level of the water in the river (and consequently the water in the pit) would rise more than fifteen feet above the normal pool, Mr. Wright ceased mining operations and moved the dragline and the processing plant to higher ground. Due to fluctuations in the normal pool of the river prior to 1971 when the new Cannelton Dam was put into operation, the plaintiff had available some 170 average work days per year to mine the pit.

Although the dragline was capable of mining sand and gravel both above and below the surface of the water, Cloverport at all times worked the pit from beneath the water. The reach of the dragline was limited, however, and the maximum depth to which the plaintiff could extract sand and gravel was approximately 18 to 20 feet below the water's surface. Cloverport routinely excavated material down to this limit, which lay at 338 to 340 feet msl. The normal pool of the river prior to 1971 was 358 msl.

Due to the natural tendency of sand and gravel to cave in on itself if left standing at too steep an angle, Cloverport found it necessary to leave a portion of otherwise marketable reserves in place. This sand and gravel was left in slopes or banks to provide lateral subjacent support to property adjoining Cloverport's tract. Had Cloverport mined its property boundary to boundary—using a "cookie cutter" approach leaving vertical banks—the inevitable result would have been a caving in of the adjoining property into the excavated pit.

The slope necessary to provide adequate support to adjoining property is determined by the composition of the property's sand and gravel deposits. Immersed sand and gravel tends to "melt," causing a decrease in the angle of repose. Dry sand and gravel is therefore capable of standing at a steeper angle than does sand submerged in water.

By core drilling a mineral property in various places, a mining operator is able to ascertain the composition of the deposits. Core drilling thus allows the operator to determine the expected angle of repose in a particular area of the property. With this knowledge, the mining operator is able to calculate the distance he must maintain between his pit and the boundaries of the property. Core drilling also reveals the extent of the property's mineral reserves. Cloverport never core drilled its property to determine the extent of its reserves, although four "test holes" were dug in preparation for this lawsuit.

Using its dragline prior to 1971, Cloverport extracted up to a maximum of 1,000 tons of sand and gravel from the property daily. After processing the raw materials, Cloverport stockpiled sand for subsequent sale. Gravel made up very little of Cloverport's total sales, and the plaintiff found it unnecessary to maintain a stockpile of gravel. Mr. Wright frequently used unmarketed gravel as backfill and slope material, dumping it into areas of the pit which already had been mined.

The plaintiff did not maintain records reflecting the amount of material produced annually. For the purposes of this case, the plaintiff arrived at estimates of annual tonnage sales on the basis of dollar sales data as reflected in its income tax returns and annual financial statements. For the period from 1963, Cloverport's first full year of operation, through 1972, the plaintiff's estimates of tons sold were:

| Year | Tons |
|------|------|
| 1963 | 72,000 |
| 1964 | 44,000 |
| 1965 | 33,000 |
| 1966 | 36,000 |
| 1967 | 44,000 |
| 1968 | 70,000 |
| 1969 | 43,720 |

| 1970 | 41,786 |
| 1971 | 56,871 |
| 1972 | 49,859 |

On the basis of these estimates, the plaintiff had average annual sales of 49,124 tons. This material was marketed by truck and by rail.

In 1967, at a net cost of $11,000, the plaintiff installed on its property a railroad spur which connected to the L & N Railroad tracks lying beyond the southern boundary of the property. Using this spur, the plaintiff was able to serve customers as far away as 300 miles. During the 1970's, however, railroad freight rates began to escalate rapidly for hauling sand and gravel in the Ohio River Valley area. Therefore, Cloverport ceased transporting sand by rail in 1973, and began relying solely on truck transport.

Natural fluctuations in the level of the Ohio River at various times of the year impeded navigation on the river. Accordingly, the Cannelton Locks and Dam Project (Cannelton Project) was begun by the United States Army Corps of Engineers in the mid-1960's to build a navigation dam nine miles downstream from Cloverport at Cannelton, Kentucky. The purpose for the Cannelton Dam was to increase the normal minimum pool[1] of the Ohio River and stabilize fluctuations in the water level, thus providing year-round navigable depths between the dam and the McAlpine Dam, located 107.3 miles upstream on the river from the plaintiff's property.

Before the Cannelton Dam was completed in 1971, the normal minimum pool of the Ohio River was 358 feet msl. As designed, the dam was to raise the normal pool of the Ohio River 25 feet to 383 feet msl. In anticipation of this change in the normal pool of the river, the United States filed a Declaration of Taking with the United States District Court for the Western District of Kentucky for the purpose of acquiring lands that would be overflowed, flooded and submerged by the project. With regard to Cloverport's land, the affected area totalled 2.25 acres. Thereafter, Cloverport was compensated for the taking of the condemned 2.25 acres. *United States v. 75.30 Acres of Land, Etc.*, No. C–6767–L(B) (W.D.Ky.1982).

On September 5, 1971, the Corps of Engineers closed the gates of the Cannelton Dam. As a result, the normal pool of the Ohio River was raised from 358 feet msl to 383 feet msl between the Cannelton Dam and the McAlpine Dam. Due to the porous nature of the plaintiff's property, the permanent rise in the normal pool of the river caused a foreseeable corresponding rise in the water table underlying Cloverport's property and resulted in the permanent flooding of the portion of plaintiff's sand and gravel pit which lay between 358 feet msl and 383 feet msl.

Cloverport continued to remove sand and gravel from its property with the dragline after September 1971. However, because the dragline was unable to excavate more than 20 feet below the surface of the water in the pit, the plaintiff was unable to mine its property to the same depth it had before the normal pool was raised. Whereas the plaintiff had routinely excavated sand and gravel to a depth of 338–340 feet msl before the rise in the water level,[2] Cloverport now found that the reach of the dragline was limited to 358 feet msl (the approximate depth of the layer of hardpan) after September 1971.

During February 27–29, 1972, a natural flood caused the pool of the Ohio River to rise to above 395 feet msl. The river be-

---

1. The term "normal pool" as used in the operation of navigation dams refers to the minimum level that the dam is designed to maintain in the river. The term does not signify an average or prevalent pool. Rather, the normal pool is the minimum pool, or level, maintained upstream from the dam.

2. Before the rise in the normal pool of the river, Cloverport's ability to mine to a maximum depth of 338–340 feet msl was dependent upon the river's level remaining at the normal pool of 358 feet msl. Any natural rise in the pool of the river caused the reach of the plaintiff's dragline to be reduced by a corresponding degree.

gan to recede on March 8 or 9, 1972, and reached the normal pool of 383 feet msl on March 12 or 13. Another flood event caused the river to rise to an elevation of 395 feet msl or higher in mid-April, 1972. The river began to recede April 28, 1972. Under normal circumstances, the Cannelton Dam would have halted the recession of the river at the normal pool of 383 feet msl. However, the Corps of Engineers chose to allow the river to recede to 373 feet msl to allow for the demolition and removal of an old dam located upstream from the Cannelton Dam and plaintiff's property. Thereafter, on May 4, 1972, the levee separating the plaintiff's pit from the Ohio River collapsed into the river.

As a result of the collapse of the levee, the plaintiff's sand and gravel pit has been open to the river since May 4, 1972. The pit therefore is no longer protected from the rapid fluctuations in the water level of the river, and the river carries suspended solids and other debris into the area of excavation.

Following the collapse of the levee in May 1972, Cloverport halted the dragline mining operations. Chief among the plaintiff's reasons for discontinuing dragline mining was the possibility of relatively rapid fluctuations in the level of the river, which made it increasingly difficult for the plaintiff to position its dragline and processing plant effectively without both being periodically inundated with the fluctuating water. After surveying the sand and gravel mining operations of several area mining businesses, Mr. Wright determined that Cloverport could more efficiently mine its property with a hydraulic dredge.[3] Mr. Wright therefore purchased and installed a used hydraulic dredge on the Cloverport property.

Cloverport incurred substantial expenses in converting from a dragline to a dredging operation. In addition to the cost of the dredge itself, the plaintiff found it necessary to obtain various equipment used in washing and processing sand and gravel. A classifying tank was needed to separate out the larger material extracted from the pit. A secondary washer was essential to separate smaller material. Other necessary equipment included a pump box, piping, barrels and several electric motors. The total net cost to the plaintiff of purchasing and installing the dredge and various additional equipment totalled $46,937.40.

In April 1973, Cloverport began mining operations with the dredge. Initially, Mr. Wright was optimistic that he would be able to extract more sand and gravel from his property than he had with the dragline at approximately two-thirds of the cost of the dragline operation. Unlike the dragline, the reach of Cloverport's dredge was not limited to a certain depth beneath the water's surface. The dredge had a potential capability of mining mineral deposits to depths of approximately 70 feet below the surface of the pit.[4] Moreover, because the dredge was mounted on a floating platform, Cloverport's operation was no longer affected by fluctuations in the water level which previously had resulted in interruptions in the dragline mining operation. It was estimated that the plaintiff, using the dredge method of operation, would be able to work some 236 average work days per year now that the normal pool of the river had been raised to 383 feet msl.

However, Mr. Wright soon became dissatisfied with the dredge operation. Unlike the dragline, the dredge, as purchased and equipped by Cloverport, was unable to break through the hardpan located at 358 feet msl. Only with the purchase of additional attachments would the plaintiff's

3. A hydraulic dredge consists of a pumping station, permanently mounted on dry land, attached to a pipe or hose which extends over the surface of the sand pit on floats or pontoons. The pipe is lowered below the surface of the water to the floor of the pit, where it extracts sand and gravel with suction, together with a substantial amount of water. Because of the manner in which the dredge operates, dredge mining is generally considered "wet" mining, as opposed to the "dry" type mining done with the dragline.

4. To a depth of 313 feet msl.

dredge be capable of penetrating the hard-pan to extract the sand and gravel material lying beneath the hardpan. Cloverport, however, did not purchase this additional equipment. Mr. Wright also discovered that the dredge could not effectively mine the sand from the southwestern area of the property, where the mineral deposits had a tendency to stand at a nearly vertical angle. Whereas the dragline had been effective at causing the material to cave into the pit, the dredge was ineffective at causing the wall to cave.

In view of the foregoing difficulties, Mr. Wright concluded that the dredge system of mining was not as efficient as the dragline method had been. Moreover, Mr. Wright believed that the dredge was more costly to operate. This he attributed to increased fuel and electricity consumption, increased repair costs and the need for additional manpower to operate the equipment. As a result of additional operating costs associated with the use of the dredge, the plaintiff contends that the profitability of its business has decreased dramatically. Mr. Wright asserts that the dredging operation yields a net profit of 15 cents to 18 cents per ton of material, approximately one-half of the 28 cents to 30 cents per ton profit which Mr. Wright estimated he realized from the dragline operation. Further, since installing the dredge, the the plaintiff has been extracting a maximum of 150 tons of sand and gravel from its pit each operating day, as opposed to its maximum production of 1,000 tons per day when it operated with the dragline.[5]

On June 17, 1977, Cloverport filed this action in the United States Court of Claims seeking just compensation for the diminution in the fair market value of its property caused by the 25 foot rise in the normal pool of the Ohio River. On February 8, 1979, the plaintiff filed a motion for sum-mary judgment on the issue of liability. The United States initially opposed the plaintiff's motion but on October 29, 1979, the parties filed with the court a stipulation for entry of judgment on the issue of liability, which was accepted by the U.S. Court of Claims. Thereafter, a trial on the issue of damages was held in Louisville, Kentucky on March 22–26, 1982.

### Discussion

Before this Court, the plaintiff asserts that the 25 foot rise in the normal pool of the Ohio River resulted in a substantial diminution in the value of its property. Specifically, Cloverport maintains that the rise of the water caused a diminution of at least $165,000 in the value of its property. The plaintiff asserts that the rise in the water level in the river, and consequently in the pit, caused increased operating expenses and reduced by approximately 12 cents the per ton profit that a potential purchaser would otherwise have expected to realize from the property. The plaintiff further maintains that in the permanently flooded area between 358 feet msl and 383 feet msl the angle of repose of the deposits has been changed from a slope of 1:3 or 1:4 (vertical: horizontal) to approximately 1:11. This change alone, the plaintiff asserts, took approximately $202,000 in sand and gravel deposits. Cloverport also contends that the rise in the water level caused the collapse of its levee into the river, a structure having an asserted 1971 value of $20,-000. Finally, Cloverport seeks $11,000 as compensation for the value of its railroad spur track which the plaintiff contends was taken because it was no longer able to produce enough sand and gravel to supply customers by rail due to the flooding.

The defendant counters that the plaintiff has failed to meet its burden of establish-

---

**5.** Cloverport's estimated production for the years 1973 through 1980 was:

| | |
|------|--------|
| 1973 | 51,596 |
| 1974 | 44,756 |
| 1975 | 33,000 |
| 1976 | 26,632 |
| 1977 | 37,271 |
| 1978 | 52,000 |
| 1979 | 43,902 |
| 1980 | 29,994 |

On the basis of these estimates, Cloverport has had an average annual rate of production of 39,894 tons.

ing that it was entitled to recover for any diminution of its property caused by the raising of the normal pool of the Ohio River. Specifically, the defendant maintains that the plaintiff's valuation witness arrived at a valuation of plaintiff's property by capitalizing the profits from a hypothetical sand and gravel business. Such a method of valuation, defendant asserts, is far too conjectural and incorporates elements of compensation for noncompensable consequential damages. Moreover, the defendant asserts that even if capitalization of profits is an acceptable valuation method, there is insufficient factual support in the record for a profit capitalization analysis.

The defendant further asserts that the plaintiff's claim for the loss of its levee and railroad siding are without legal or factual foundation. The collapse of the levee, defendant maintains, was not due to the raising of the pool of the river, but rather to the fact that it was an unstable structure that was doomed to collapse ultimately. In addition, the defendant asserts that the plaintiff's claim for the loss of the use of its railroad siding is in reality a noncompensable claim for damages for loss of business.

For the reasons discussed in this opinion, the Court has concluded that the record supports a finding that the plaintiff's property has been diminished by $9,190, and is therefore entitled to this figure as just compensation for the governmental taking.

## I. The Constitutional Framework

■ The fifth amendment to the United States Constitution provides that private property may not be taken for public use without just compensation. The Supreme Court has determined that the term "just compensation" means the full monetary equivalent of the property taken. *Almota Farmers Elevator & Whse. Co. v. United States*, 409 U.S. 470, 473, 93 S.Ct. 791, 794, 35 L.Ed.2d 1 (1973). The owner of property taken by the sovereign is entitled to be put in the same position, from a monetary standpoint, as if there had been no taking. *Id.* at 473–74, 93 S.Ct. at 794–95; *see also*

*Foster v. United States*, 2 Cl.Ct. 426, 445 (1983) (appeal pending No. 84–724 Fed.Cir.).

■ The process of awarding just compensation cannot be reduced to a mere formula, *United States v. Cors*, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392 (1949), nor can it be limited to inexorable rules. *United States v. Toronto, Hamilton & Buffalo Navigation Co.*, 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949); *see also United States v. 3969.59 Acres of Land*, 56 F.Supp. 831, 838 (D.Idaho 1944). In determining an award of just compensation, however, the court must consider notions of fairness and equity. *See United States v. Fuller*, 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973); *Foster v. United States, supra*, 2 Cl.Ct. at 446.

■ A landowner whose property is taken often receives less for his land than whatever special value the land had to him before the taking. *United States v. Petty Motor Co.*, 327 U.S. 372, 377, 66 S.Ct. 596, 599, 90 L.Ed. 729 (1946). This is because "[t]he value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker." *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949). Moreover, a taking may involve elements of incidental or consequential damage. Of necessity, these elements of damage are noncompensable. The Eighth Circuit has observed that although "the rule may appear unjust, it is well settled that the landowner is not entitled, at least within the framework of a condemnation suit, to be compensated for such consequential damages as loss of business, relocation expenses, and the like." *United States v. 91.90 Acres of Land*, 586 F.2d 79, 87 (8th Cir.1978). The need to exclude elements of consequential damage in arriving at a fair and equitable valuation has caused the courts to rely upon the concept of fair market value. In *Kimball Laundry Co. v. United States, supra*, the Supreme Court noted:

"Most things * * * have a general demand which gives them a value transfer-

able from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. 338 U.S. at 5, 69 S.Ct. at 1437. Thus, the fair market value of the property at the time of a taking has become the accepted criterion for determining just compensation for the taking of that property. *United States v. Miller*, 317 U.S. 369, 373–74, 63 S.Ct. 276, 279–80, 87 L.Ed. 336 (1943); *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); *Foster v. United States, supra*, 2 Cl.Ct. at 445. The term "fair market value" has been defined to be the amount a willing buyer would agree to pay a willing seller in cash, with neither party being under a compulsion to buy or sell and with both being fully informed about all relevant matters relating to the circumstances surrounding the transaction. *See United States v. Miller, supra*, 317 U.S. at 374, 63 S.Ct. at 280; *Georgia-Pacific Corp. v. United States*, 226 Ct.Cl. 95, 105, 640 F.2d 328, 335 (1980).

■ Where the interest taken is less than the total estate, just compensation is determined by reference to the difference between fair market value immediately before the taking and the fair market value of the property remaining immediately after the taking. *United States v. Miller, supra*, 317 U.S. at 376, 63 S.Ct. at 281; *United States v. 47.14 Acres of Land, More or Less*, 674 F.2d 722, 725 (8th Cir. 1982); *Georgia-Pacific Corp. v. United States, supra*, 226 Ct.Cl. at 105, 640 F.2d at 336. This diminution is frequently referred to as severance damage. *United States v. Miller, supra*, 317 U.S. at 376, 63 S.Ct. at 281. The Eighth Circuit has observed that the concept of severance damage has been a source of confusion:

It is incorrect to think of "severance damage" as a separate and distinct item of just compensation apart from the dif-

ference between the market value of the entire tract immediately before the taking and the market value of the remainder immediately after the taking. In the case of a partial taking, if the "before and after" measure of compensation is properly submitted to the jury, there is no occasion for the lawyers or the trial court to talk about "severance damage" as such, and indeed it may be confusing to do so. * * * The matter is taken care of automatically in the "before and after" submission.

*United States v. 91.90 Acres of Land, supra*, 586 F.2d at 86 (citation omitted).

■ The burden of proof rests with the plaintiff who alleges a depreciation in the value of his land due to a partial taking. *Georgia-Pacific Corp. v. United States, supra*, 226 Ct.Cl. at 107, 640 F.2d at 337. The compensation claimed must be supported by competent evidence in the record. *United States v. 47.14 Acres of Land, More or Less, supra*, 674 F.2d at 725. The landowner is entitled to have the fact finder determine the fair market value of the land taken by reference to the land's highest and best use, together with all other factors of value which would tend to influence the property's value. *United States v. 91.90 Acres of Land, supra*, 586 F.2d at 86–87. One factor affecting value is the presence of mineral deposits in place as of the date of the taking. However, arriving at a valuation by multiplying an assumed quantity of mineral reserves by a unit price is almost universally disapproved by the courts. *Id.* at 87; *see, e.g., United States v. Sowards*, 370 F.2d 87, 90 (10th Cir.1966); *United States v. 13.40 Acres of Land*, 56 F.Supp. 535, 538–39 (N.D.Cal. 1944); *Foster v. United States, supra*, 2 Cl.Ct. at 446. Rather, the land must be valued as a whole, with appropriate weight being given to facts and circumstances which would have a bearing on the price a willing purchaser would pay. *United States v. 3969.59 Acres of Land, supra*, 56 F.Supp. at 838.

Appraisal experts employ several generally accepted appraisal methods in the valu-

ation of real property. The most frequently used method, the comparable sales approach, uses as evidence of market value sales of other properties that are reasonably similar to the property to be appraised. The cost approach to valuation consists of the calculation of a depreciated replacement cost as evidence of market value. The third appraisal method, the income capitalization approach, derives a valuation from a calculation of the present worth of the stream of income which the property is capable of producing over its useful economic life.

It is generally accepted that comparable sales provide the best evidence of value. *See United States v. 179.26 Acres of Land*, 644 F.2d 367, 371 (10th Cir.1981). However, where no comparable sales evidence is available, the income capitalization approach is, for the most part, considered the next best approach to valuation. *Id.* at 372; *see also* 4 J. Sackman, *Nichols' The Law of Eminent Domain* § 12.312, at 12–181 (3d rev. ed. 1981) (hereinafter cited as *Nichols' Law of Eminent Domain*). The cost approach is in some circumstances appropriate where the property taken has no ready market and the income capitalization approach cannot be used. *E.g., United States v. Two Acres of Land*, 144 F.2d 207 (7th Cir.1944) (church); *Pete v. United States*, 209 Ct.Cl. 270, 531 F.2d 1018 (1976) (cabin-type barges on landlocked lake). The parties to this case have agreed that available relevant data on comparable sales is insufficient to provide a valid basis for valuing the plaintiff's property. They have also agreed that the income capitalization appraisal method is the most appropriate method to use under the circumstances of this case. However, the parties use slightly different variations of the income capitalization method.

## II. Valuation of the Sand and Gravel Pit

### A. *The Plaintiff's Appraisal*

In establishing its alleged damages, the plaintiff relied upon the testimony of Mr. Hubert Bruce, the former owner of the subject property, Mr. Silas Wright, the plaintiff's president, and Mr. Richard Mosley, a real estate appraiser. Mr. Bruce first became involved in the sand and gravel business in 1946. Prior to selling the 32 acre tract to Mr. Wright and Mr. Tobin, Mr. Bruce testified, he had been mining sand and gravel from the property for approximately four or five years. Mr. Bruce testified that when he first began extracting material from the property he estimated that it contained approximately 6,000,000 tons of extractable sand and gravel in a seam that extended to a depth of 90 to 100 feet. During the time he operated the pit, he estimated that he had extracted approximately 700,000 to 800,000 tons of material. In Mr. Bruce's opinion, the sand underlying the Cloverport property has unique characteristics of size, shape and color and is of a very high quality.

Mr. Bruce assigned a before-taking value of $1,500,000 to the plaintiff's property. This estimate was derived from Mr. Bruce's assumption that the property contained 6,000,000 tons of removable material, which he valued at 25 cents per ton. In Mr. Bruce's opinion, the 1971 rise in the level of the water in the pit resulted in a loss of approximately 40 percent of previously recoverable reserves. This loss, Mr. Bruce stated, was due to the tendency of sand to seek a relatively gentle angle of repose when it is submerged. Whereas dry sand is capable of resting with a slope of 1:3 or 1:4, wet sand tends to seek a greatly reduced slope of approximately 1:10 or 1:11. Thus, Mr. Bruce testified, the rise in the water level increased the distance that Cloverport must maintain between its pit and the adjoining real estate. Assuming a value of 25 cents per ton, Mr. Bruce's estimates result in a $600,000 diminution in the value of the property.

After giving due consideration to Mr. Bruce's testimony, the Court concludes that his valuation estimates are unnecessarily speculative and must be rejected. Although an owner or former owner of property frequently has special knowledge about the property in question and is therefore deemed competent to offer an opinion

as to valuation, the opinion "must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption." *United States v. Sowards, supra,* 370 F.2d at 92. This court is constrained to conclude that Mr. Bruce's testimony has little, if any, probative weight.

Mr. Bruce's valuation, based on the product of estimated tonnage times a specified unit price, is a deviation from proper valuation standards. *See, e.g. United States v. 91.90 Acres of Land, supra,* 586 F.2d at 88; *United States v. Sowards, supra,* 370 F.2d at 90; *United States ex rel. Tennessee Valley Auth. v. Indian Creek Marble Co.,* 40 F.Supp. 811, 822 (E.D.Tenn.1941). For this reason alone, the Court must reject Mr. Bruce's valuation. Moreover, the record discloses that much of Mr. Bruce's testimony consisted of unfounded estimates and guesses. When being deposed before trial, the witness demonstrated a singular lack of knowledge of relevant facts regarding the property. For example, he did not remember whether the property had river frontage; he could not recall the date he had bought the property; he did not know how many years he had mined the property before he sold it; and he did not know how many acres he had mined. In view of Mr. Bruce's apparent lack of familiarity with the property before trial, the Court is led to the conclusion that the witness's opinions offered at trial were little more than extemporaneous guesses.

Mr. Wright also testified for the plaintiff. He estimated that the seam of sand and gravel underlying the property extended to a depth of at least 85 feet beneath the layer of overburden. Based on the area that Mr. Bruce had disturbed, Mr. Wright estimated that, as of 1962, the property contained between 5,000,000 and 6,000,000 tons of reserves. As of 1971, Mr. Wright estimated that the equivalent of five acres had been mined to exhaustion.

Mr. Wright assigned a 1971 before-taking value of between $475,000 and $500,000 to the property. After the rise in the water level, Mr. Wright estimated that Cloverport's property had a value of $250,000 to $275,000. The difference between the before-taking value and the after-taking value, Mr. Wright stated, was due to additional costs the plaintiff encountered in extracting sand and gravel from the pit. Mr. Wright also noted that since the rise in the water level, he has been unable to extract material from beneath the hardpan layer located at 358 feet msl.

Although Mr. Wright has been involved in mining the property since 1962, and is knowledgeable about its characteristics, his qualification to testify on the issue of value does not alter the concept of market value by permitting the substitution of a "value for me" standard. *See United States v. Sowards, supra,* 370 F.2d at 92. On cross-examination, Mr. Wright testified that included in his before-taking value was the value of both the land and business. Although the plaintiff was entitled to offer evidence that the rise in the water level caused increased expenses and resulted in decreased efficiency, and this may have raised an inference that a buyer would have paid less for the property, the plaintiff may not claim damage to its business operations as an element of compensation. *Cf. United States v. 91.90 Acres of Land, supra,* 586 F.2d at 87. Although this Court declines to accept Mr. Wright's valuation of Cloverport's property, much of his testimony was helpful to the Court in arriving at its own appraisal estimate.

The plaintiff also relied upon Mr. Richard Mosley, a civil engineer who had worked in the appraisal business for approximately 30 years, to establish a 1971 before and after value for the plaintiff's land. Mr. Mosley submitted a three page appraisal report and testified for the plaintiff in support of his valuation conclusions. On the basis of his calculations, Mr. Mosley concluded that as a result of the 1971 rise in the water table underlying the plaintiff's property, the property had been diminished in value by approximately $165,000.

Mr. Mosley used the income capitalization approach to arrive at before and after values of the plaintiff's property. Initially, the appraiser estimated that the property

contained reserves of sand and gravel to a depth of 82 feet (extending to 338 feet msl).[6] On the basis of this assumption, Mr. Mosley concluded that the property contained total reserves of 5,320,000 tons. Of this amount, Mr. Mosley testified, 1,320,000 tons should be left in place as supporting banks. Thus, according to Mr. Mosley's appraisal, the property contained before-taking recoverable reserves of 4,000,000 tons. Assuming that a knowledgeable sand and gravel operator would consider an extraction rate of 160,000 tons per year reasonable, and that a market existed for that amount, Mr. Mosley calculated a useful economic life of 25 years for the property.

On the basis of his analysis of Cloverport's 1973 operating statement, and relying on his knowledge of the sand and gravel business, Mr. Mosley concluded that a knowledgeable sand and gravel operator would seek to realize a net profit of approximately 29 cents per ton for material extracted from the property. He then applied a 9.5 percent discount rate to the 25-year life of the property. Using the foregoing assumptions as the basis for his calculations, Mr. Mosley arrived at a 1971 before-taking value of $443,188.

Mr. Mosley then concluded that after the rise of the water level in 1971, the cost to Cloverport of extracting sand and gravel increased by approximately 10 to 15 cents per ton, thus reducing the expected per ton profit to approximately 18 cents per ton. Substituting this reduced per ton profit figure in his calculations, Mr. Mosley calculated an after-taking value of $227,087. In his report, he concluded: "It is easily seen that with the additional operational costs, the indicated value for Subject was reduced approximately $165,000. Therefore, in my opinion the difference between these two values indicates the damage to the remainder after the taking."

After giving due consideration to Mr. Mosley's appraisal report and his testimony, the Court has concluded that his valuation of the plaintiff's property is not supported by the record. Moreover, Mr. Mosley relied on an impermissible appraisal technique in valuing the plaintiff's property.

 As discussed previously, in the absence of evidence of comparable sales, capitalization of net income provides the next best method of valuation. In considering appraisals based on income capitalization, the Court must draw a distinction between the capitalization of income generated by the property itself and income derived from a business conducted on the property. *See United States v. Land in Dry Bed of Rosamond Lake, Cal.*, 143 F.Supp. 314, 318 (S.D.Cal.1956); 4 *Nichols' Law of Eminent Domain, supra,* § 12–3121, at 12–195. Federal courts have frequently criticized and rejected valuations based on capitalization of profits as being uncertain and speculative. *E.g., United States v. Brinker,* 413 F.2d 733, 735 (10th Cir.1969); *United States v. Meyer,* 113 F.2d 387, 397 (7th Cir.1940). Profits derived from business activities depend to a greater extent upon the amount of capital invested and the good fortune, business skill and management with which the business is conducted than upon the land itself. *Welch v. Tennessee Valley Auth.,* 108 F.2d 95, 100 (6th Cir.1939).

The plaintiff has urged that although the foregoing cases may represent a judicial attitude of nearly 50 years ago, they do not embody the state of the law on this issue currently. In support of its position, Cloverport relies on two cases: *United States v. 179.26 Acres of Land,* 644 F.2d 367 (10th Cir.1981), and *Georgia-Pacific Corp. v. United States,* 226 Ct.Cl. 95, 640 F.2d 328 (1980). The plaintiff's arguments in this regard are not compelling.

---

**6.** Cloverport never core drilled its property to any great extent and therefore did not have accurate data as to the depth of the deposits. Mr. Wright did excavate several test holes (four) to an asserted depth of 100 feet. Mr. Mosley stated that he considered his estimate of an 82 foot seam to be conservative.

Although *United States v. 179.26 Acres of Land* is supportive of the plaintiff's profit capitalization approach, the case does not state any persuasive argument in support of profit capitalization. The court merely noted:

> The courts have recognized that if the proof is not deficient, a present value for mineral interests taken in eminent domain proceedings may be determined by estimating the anticipated income that might be derived from the sale of the minerals over a period of time, and capitalizing that income in terms of its present worth.

644 F.2d at 373. The Tenth Circuit's justification for endorsing the profit capitalization approach rested upon in its acknowledgement that any valuation based on the income approach necessarily involves speculation and conjecture. On the record before it, the court concluded: "We are convinced, from a complete review of the record, that the landowners' evidence was sufficient to allow the Commission to make an informed estimate as to the fact of value." *Id.* It is significant to note that in the three years since the Tenth Circuit's decision, not one court has followed, quoted or even cited the case. Thus, this Court is not prepared to follow the Tenth Circuit's lead in accepting a valuation based on capitalization of profits.

The plaintiff's reliance on *Georgia-Pacific Corp. v. United States* also is misplaced. In that case the trial judge based a portion of his severance damage award on a calculation that involved multiplying the amount of timber lost as a result of the taking by a stipulated value per thousand board feet. The trial judge noted that a before and after valuation was preferable, but observed that the valuation witnesses for both parties had instead undertaken a "category by category" approach, valuing the diminution in value of the total property on an item-by-item basis. It is sufficient to note that in *Georgia-Pacific*, the parties had stipulated to a unit price per thousand board feet of timber and the amount of timber in place on the property was ascertained. No speculative elements were involved. In contrast, in the present case, the plaintiff has asked this Court to base a capitalization analysis on anticipated profits which are, at best, highly speculative. Moreover, this Court has serious reservations regarding the accuracy of the plaintiff's profit records, and does not believe that they form an adequate basis for a profit capitalization analysis.

The validity of income capitalization as a valuation technique is dependent upon the existence of a competent evidentiary foundation. All facts which must necessarily form the elements of the capitalization equation must be established by the evidence. *United States v. 47.14 Acres of Land, More or Less, supra*, 674 F.2d at 726; *United States v. Whitehurst*, 337 F.2d 765, 776 (4th Cir.1964). Accurate calculation of a per ton profit is dependent upon the existence of records which substantiate the asserted rate of production and accurate records which reflect the business's income and expenses. The record in this case does not establish to this Court's satisfaction that the plaintiff's business records meet these requirements.

The plaintiff did not maintain records which reflected its annual production. Rather, the plaintiff based its calculations on sales as reflected in federal income tax returns and in annual financial statements. Mr. Wright testified that until 1973, some of the sand Cloverport sold was taken from previously mined stockpiles. In any given year, therefore, a percentage of the plaintiff's sales would have consisted of material mined in previous years. This would skew the plaintiff's annual per ton profit calculations. Moreover, the only data as to income and expenses that Cloverport presented were in income tax records and in annual financial statements. Mr. Wright testified that he had not reviewed the tax returns before filing and could not vouch for their accuracy. Further, the financial statements were not audited, and the preparers included a disclaimer that no opinion was expressed as to their accuracy.

The plaintiff's financial calculations are further rendered suspect because the financial records fail to reflect all of the plaintiff's business expenses. For example, when Cloverport operated with a dragline, it occasionally used a truck owned by the White Stone Company to haul material to the processing plant; an employee of the White Stone Company drove the truck. Cloverport also operated for several years with a dragline that had been purchased and transported by the White Stone Company at a cost of approximately $4,800. The absorbtion of a portion of Cloverport's operating expenses by its sister company would necessarily affect the plaintiff's profit figures.

A further infirmity with Mr. Mosley's use of a 20 cent per ton profit figure is that he based this figure on his analysis of only one year's production—1973. Mr. Mosley testified: "This particular figure happens to be the exact figure as shown in the 1973 operating statement. Now the reason that I used that was because I had more information on 1973 than any other information that was available when I did this." A per-ton profit assumption based on one year's production clearly cannot form the basis for an accurate valuation calculation.

The record also does not support Mr. Mosley's estimates of the amount of recoverable reserves on the property as of 1971. The appraiser estimated that as of 1971, 29 acres of the property remained unmined. According to the appraiser's calculations, these 29 acres contained 5,320,000 total tons of reserves in a seam to a depth of 82 feet. Of this amount, Mr. Mosley stated, 1,320,000 tons should be left in place as supporting banks, leaving a total of 4,000,000 tons as extractable reserves.

Mr. Mosley testified that in calculating the property's reserves, he assumed that one cubic yard of material was the equivalent of one ton. He testified that this equivalency was not entirely accurate, i.e., in reality one cubic yard of material was equivalent to 1.3 tons. This latter equivalency was confirmed by Mr. Chester Crumbo, a sand and gravel operator who testified for the defense that there are approximately 1,600 cubic yards per acre for each foot of depth. Assuming an equivalency of 1.3 tons per cubic yard, each foot of depth would contain approximately 2,080 tons per acre. Using Mr. Mosley's assumptions of 29 acres remaining unmined and a depth of 82 feet, the plaintiff's property would contain total reserves of 4,946,240 tons, some 373,760 tons less than Mr. Mosley estimated. Using Mr. Mosley's equivalency of one ton per cubic yard, the result is even more disparate: total reserves would equal 3,804,800 tons, 1,515,200 tons less than Mr. Mosley's estimate.

The record also does not support Mr. Mosley's assumption that projected sales of 160,000 tons per year could be expected over a period of 25 years. Although this Court agrees with Mr. Mosley that the plaintiff's property is capable of producing 160,000 or more tons of material annually, there is no support to be found in the record that such an amount could be marketed successfully. Mr. Mosley did not conduct a market survey to ascertain whether a market capable of absorbing 160,000 tons existed annually. The appraiser also admitted that at the time he prepared his report, he was unaware of how much tonnage Cloverport's competitors produced and sold. In sum, Mr. Mosley's conclusions are based on the assumption of the existence of a market capable of absorbing two to three times the amount of material Cloverport has produced and marketed in the past. Thus, although this Court accepts Mr. Mosley's contention that the plaintiff's property is capable of producing 160,000 tons per year, it is unable to find support in the record that such an amount could be marketed.

It is clear from the record that Mr. Mosley's valuation technique incorporates elements of purported damage to the plaintiff's business. It is well settled that, at least within the context of an action for just compensation under the fifth amendment, injuries to a landowner's business are not compensable. *See, e.g., Bothwell v. United States,* 254 U.S. 231, 233, 41 S.Ct.

74, 75, 65 L.Ed. 238 (1920); *United States v. 91.90 Acres of Land, supra,* 586 F.2d at 87; *Georgia-Pacific Corp. v. U.S., supra,* 226 Ct.Cl. at 147 & n. 44, 640 F.2d at 361 & n. 44. Nevertheless, at trial, Mr. Mosley stated on several occasions that it was impossible to arrive at a value for the real property unless the business also was considered. This was because "[t]he value is so interwoven with the business or the use to which it is being put that it is almost impossible to come up with a value to this property unless you consider both the property and the business * * *." When asked on cross-examination whether his valuation included the good will of the plaintiff's business, he replied, "yes, it includes everything. As I have said before, they are interchangeable. You can't separate them." In plaintiff's objections to the defendant's requested findings of fact, the plaintiff asserted: "we continue to submit that in valuing this total piece of property *and business, and damage to both,* this Court must ask what a willing buyer would likely expect to produce from this pit" (emphasis added).

█ In summary, Mr. Mosley's appraisal does not measure the diminution in value of the plaintiff's land caused by the rise in the water level. The appraisal was, in effect, a valuation of Cloverport's sand and gravel business, and must be rejected by this Court. *See United States v. 13.40 Acres of Land, supra,* 56 F.Supp. at 539.

### B. *The Defendant's Appraisal*

The defendant relied upon three appraisal witnesses to establish the before and after values of the plaintiff's property. Mr. John Donan, Mr. Donald Cranor and Mr. Bernard Carmichael each prepared appraisal reports and testified in support of their valuations. Mr. Donan and Mr. Cranor utilized both the cost and income capitalization approaches in valuing the plaintiff's property. Mr. Carmichael relied solely upon the income capitalization approach.

█ The plaintiff objects to the use of the cost approach in valuing its property. This Court agrees with the plaintiff that the cost approach is an inappropriate valuation method in this case. Because the plaintiff's property is an income producing property capable of producing a stream of income derived from what both parties concede is the property's highest and best use, the income capitalization approach is a preferable valuation method. *See United States v. 179.26 Acres of Land, supra,* 644 F.2d at 371–72. The parties both urge the Court that income capitalization is the most appropriate valuation method in this case. This Court agrees and will disregard the cost evidence submitted by Mr. Donan and Mr. Cranor.

Mr. Donan is a professional engineer who, in the five to ten years preceding trial, spent approximately 20 percent of his time appraising mineral producing properties. Mr. Donan has been familiar with the plaintiff's property since 1963 and appraised it for the first time in 1969. In 1981 or early 1982, Mr. Donan again appraised the property for the purposes of this case.

Using the income capitalization method, Mr. Donan calculated a $67,350 before-taking value in 1971 for the property. Mr. Donan concluded that the rise in the water level had not caused any diminution in the value of the property. He therefore assigned an after-taking value of $67,350, with no resultant damage accruing to the plaintiff.

For the purposes of his income capitalization analysis, Mr. Donan concluded that the plaintiff's property contained a total of 22 acres of unmined reserves. This assumption was based on the his conclusion that, of the total 34 acres, 10.27 acres had been mined, with 1.73 acres allocated to the plant site, roads and other miscellaneous uses. Mr. Donan calculated that the unmined 22 acres contained total reserves of 2,484,533 tons of material. Not all of this material was recoverable, however, because of the need for banks to provide support to the adjoining property. Accordingly, Mr. Donan allocated 666,800 tons of material for the banks. The remaining

1,817,733 tons of material he considered recoverable. Assuming an annual rate of production of 65,000 tons, Mr. Donan calculated a useful economic life of 27.97 years for the property (1,817,733 tons/65,000 tons per year).

In projecting a stream of income from the property, Mr. Donan chose to capitalize projected royalty income rather than business profits. According to the appraiser, capitalization of royalty income ensures that only income which can be attributed to the property itself is considered. Mr. Donan located records of two royalties paid to property owners by sand and gravel operators. One lease provided for a royalty of 10 cents per ton; the other provided for an 8 cent per ton royalty. Mr. Donan adopted the higher of the two figures. On the basis of the foregoing assumptions, Mr. Donan capitalized the anticipated annual earnings of $6,500 (10 cents per ton × 65,000 tons per year) over 27.97 years at a discount rate of 9.5 percent to reach his 1971 before-taking value of $67,350.[7]

After considering the effect of the rise in the water level to 383 feet msl, Mr. Donan concluded that there had been no loss in the amount of recoverable reserves. In fact, the appraiser concluded that the rise in the water level stabilized day-to-day fluctuations in the water level in the pit and resulted in an increase by 66 days of the average annual number of days that Cloverport could mine its property. This, Mr. Donan stated, would increase production and efficiency. Because the amount of recoverable reserves remained unchanged after the taking, Mr. Donan concluded that there had been no diminution in the value of Cloverport's land; the property's value remained at $67,350.

The defendant also relied on the opinion of Mr. Donald Cranor in reaching a valuation of the plaintiff's property. Mr. Cranor, a geologist and soil scientist who has been evaluating mineral properties since

1962, prepared an appraisal report and testified in support of his appraisal at trial.

Utilizing the income capitalization method, Mr. Cranor assigned a before-taking value of $39,000 to the property. The appraiser assumed that the property contained 1,930,000 tons of recoverable reserves. Mr. Cranor concluded that the material could be extracted and marketed at a rate of 70,000 tons per year. These assumptions resulted in a projected useful economic life for the property of 27.5 years. Like Mr. Donan, Mr. Cranor utilized a 10 cent per ton royalty. A discount rate of 17.5 percent was used to capitalize the projected income from the property. This rate represented a "safe rate" of return of 7.5 percent plus 10 percent to reflect risk and market fluctuation. On the basis of these figures and assumptions, Mr. Cranor calculated a 1971 pre-taking value of $39,000. Mr. Cranor, like Mr. Donan, concluded that the rise in the water level had no detrimental effect on the plaintiff's property. The after-taking value therefore remained at $39,000.

The defendant's third valuation witness, Mr. Bernard Carmichael prepared an appraisal report and testified in support of his appraisal at trial. Mr. Carmichael has been involved in the appraisal of real estate since 1938. Over the course of his professional career, Mr. Carmichael has evaluated various types of real property, including mineral bearing properties and, specifically, sand and gravel pits.

Using the income approach, Mr. Carmichael capitalized the projected stream of income the property could be expected to produce through royalty payments, arriving at a 1971 pre-taking value of $58,750. The appraiser's calculated post-taking value of $52,200 resulted in his conclusion that the value of the plaintiff's property had been diminished by $6,550.

---

7. Mr. Donan stated that he adopted a 9.5 percent discount rate because Cloverport was a relatively risk-free, stable business operation. This he attributed in large part to the fact that sales to the White Stone Company assured the plaintiff a place in the marketplace. Mr. Donan testified that were there no relationship between White Stone Co. and the plaintiff, he would utilize a discount rate of 16 to 18 percent.

Mr. Carmichael's pre-taking valuation was based upon assumed recoverable reserves of 1,251,000 tons.[8] In forecasting future production, Mr. Carmichael considered the plaintiff's production history. The appraiser noted that Cloverport had produced sand in excess of 70,000 tons on three occasions—1963, 1971 and 1973. He thus considered a forecast of 75,000 tons per year to be the highest production figure that should be used in the capitalization analysis. Using these figures, Mr. Carmichael calculated a total useful economic life for the property of 16.68 years (1,251,000 tons/75,000 tons per year).

On the basis of his research into royalty rates being paid owners.of sand and gravel properties in the Ohio River Valley, Mr. Carmichael concluded that a royalty of 15 cents per ton would be reasonable. The appraiser used a discount rate of 18 percent to capitalize the projected income from the property, believing that this rate accurately reflected the relatively high risk involved in the sand and gravel business. As noted previously, Mr. Carmichael concluded that the plaintiff's property had a 1971 before-taking value of $58,750.

Using the data provided by Mr. Mallette, Mr. Carmichael assumed that the rise in the normal pool of the Ohio River had made unavailable 435,000 tons of material. Whereas total before-taking recoverable reserves were estimated to be 1,251,000, the recoverable reserves remaining after the 1971 rise in the water level totaled 816,000 tons. Assuming that production would remain at 75,000 tons per year, the appraiser calculated a useful economic life of 10.88 years for the property. The assumptions regarding a 15 cent per ton royalty and an 18 percent discount rate remained unchanged. Mr. Carmichael therefore concluded that the after-taking fair market value of the plaintiff's property was $52,200, and that the property had been diminished in value by $6,550.

**8.** Because the determination of the extent of the reserves was beyond his expertise, Mr. Carmichael obtained this information from Mr. Reese

## C. *The Court's Valuation*

This Court has concluded from all the evidence in the record that the plaintiff is entitled to just compensation in the amount of $9,190. In arriving at this figure, the Court relied on the income capitalization approach to capitalize projected royalty income that the plaintiff's property can reasonably be expected to produce. In fixing just compensation, this Court must seek to duplicate, with as much accuracy as possible, the before and after values a knowledgeable purchaser would have assigned to the plaintiff's property. Royalty capitalization provides the most reliable method of doing this.

Valuation evidence based on royalty capitalization is useful only if it is established that a market exists for a property's mineral reserves. It also must be established that transactions in the marketplace commonly take the form of royalty leasing arrangements. Finally, all figures which provide the basis for an award must be derived from an industry expert. *United States v. 103.38 Acres of Land, More or Less,* 660 F.2d 208, 212-13 (6th Cir.1981). All three requirements are present in this case. There is an established market for the sand and gravel extracted from the plaintiff's property. The record reveals that since the plaintiff began mining operations in 1962, it has successfully marketed sand and gravel extracted from the property. The record also establishes that royalty leasing arrangements are common in the sand and gravel business. Mr. Chester Crumbo, a sand and gravel operator with many years' experience, testified that rarely will a sand and gravel operator approach a landowner with the intention of buying property; royalty leasing arrangements are far more common. Finally, the Court has determined that all relevant factors necessary for the capitalization calculation are present in the record and have been established by competent evidence.

Mallette, an experienced mining engineer. Mr. Mallette also testified at trial.

The Court has concluded that the plaintiff's property contains total sand and gravel reserves of approximately 4,200,000 tons. This is approximately 1,000,000 tons less than the plaintiff's estimate of total reserves and is substantially more than the estimates of the defendant's experts. The Court found persuasive Mr. Wright's estimate that, as of 1971, a total of ten acres had been disturbed but only the equivalent of five acres had been mined to exhaustion. Mr. Wright has mined the property since 1962 and is familiar with the extent to which sand and gravel has been extracted from it. The estimates of Mr. Donan and Mr. Cranor, which concluded that the property contained total reserves of 2,484,533 tons and 2,412,500 tons respectively, are not supported by the record. Mr. Mallette did not calculate total in-place reserves. He did arrive at a figure representing recoverable reserves after making an allowance for supporting banks. The record is unclear as to what this allowance was.

The plaintiff's financial records provide a rough check as to the extent to which the property had been mined. According to the plaintiff's records, between 1963 and 1970 Cloverport marketed 384,506 tons of sand and gravel. The plaintiff routinely excavated this material to a depth of 340 feet msl, the equivalent of 70 feet after deducting for overburden. Assuming each acre contains approximately 2,080 tons of material per foot of depth, the material marketed by the plaintiff is the equivalent of 2.64 acres. This area, together with the two acres which Mr. Bruce had mined, approximates the five acres which Mr. Wright testified had been mined to exhaustion as of 1971. Accordingly, the estimates of Mr. Donan, Mr. Cranor and Mr. Mallette greatly underestimate the total reserves.

Having determined that the property contains approximately 4,200,000 tons of total reserves, the Court has reached the conclusion that 27 percent of that amount must be left in place as banks to provide lateral subjacent support to the adjoining real estate. Thus, the plaintiff's property contains approximately 3,066,000 tons of recoverable reserves of sand and gravel.

The Court's allocation for supporting banks is derived from an analysis of the respective estimates of Mr. Mosley, Mr. Cranor and Mr. Donan. Although Mr. Mosley's estimates of total and recoverable reserves differed substantially from those of Mr. Donan and Mr. Cranor, all three witnesses testified that roughly the same percentage of reserves should be left in place as supporting banks. Mr. Mosley stated that of total estimated reserves of 5,320,000 tons, 1,320,000 tons, or 25 percent, should be allocated for supporting banks. Mr. Cranor testified that his estimate of 1,930,000 tons of recoverable reserves should be increased by 25 percent to 2,412,500 tons to account for supporting banks. This results in a total of 20 percent of total reserves being allocated for banks. Mr. Donan's estimates of 2,484,533 tons of total reserves and 1,817,733 tons recoverable reflect an allocation of 27 percent of total reserves for banks. The record is unclear as to the amount of material Mr. Mallette allocated for banks. The similarity of the foregoing figures justifies the conclusion that 27 percent of total reserves should be allocated for supporting banks.

■ The Court has determined that the 25-foot rise in the water level of the Ohio River took from the plaintiff approximately 1,073,100 tons of previously recoverable sand and gravel. In reaching this conclusion, this Court has rejected the plaintiff's assertion that the rise in the water level deprived the plaintiff of the ability to remove material that lay beneath the layer of hardpan. The plaintiff asserts that in order to penetrate the hardpan, it must first purchase a cutter bar attachment for the dredge, which had a 1971 cost of approximately $120,000. Mr. Crumbo testified, however, that he is aware of an apparatus, available at a much lower cost than a cutter bar, which is capable of penetrating hardpan. In arguing that the rise in the level of the water deprived it of the ability to extract material below 358 feet msl, the plaintiff seems to be claiming damages arising from business frustration and costs of readjustment. Such elements of dam-

age are noncompensable. *Georgia-Pacific Corp. v. United States, supra,* 226 Ct.Cl. at 153–54, 640 F.2d at 364–65.

The loss of more than 1 million tons of material is attributable to the tendency of totally saturated sand and gravel to seek a greatly reduced slope of approximately 1:11; this reduced slope dramatically reduces the amount of sand and gravel which can be removed from below the permanent water line. Mr. Crumbo stated that the result of permanently raising the water level from 358 feet msl would be excessive caving in of the walls of the pit. As a result, the operator would find it necessary to increase the distance between the excavation and adjoining property. Mr. Donan also acknowledged this problem. The estimates of several witnesses as to the amount of reserves made unavailable by this change in slope were generally comparable. Mr. Bruce testified, for example, that approximately 40 percent of the previously available material would be unavailable. Mr. Mallette estimated that the rise in the water level made unavailable 435,000 tons. This results in a 35 percent reduction in Mr. Mallette's original estimate that the property contained 1,251,000 tons of recoverable material. Curiously, both Mr. Donan and Mr. Cranor in testifying for the Government failed to consider the effect of permanent submersion on sand and gravel. The failure of both gentlemen to take this into account is a serious defect in their valuations.

From the above discussion, the Court concludes that the permanent rise in the water level to 383 feet msl took from the plaintiff slightly more than 1 million tons of sand and gravel. This amount represents 35 percent of the total reserves of slightly more than 3 million tons previously recoverable. That this amount has been made permanently unavailable would undoubtedly weigh in the mind of a prospective purchaser of the property, and would reduce the amount he would be willing to pay for the plaintiff's land.

The capitalization of income approach requires that a property be capable of producing a stream of income over the useful economic life of the property. In the case of a mineral property, the stream of income is dependent upon an anticipated rate of production. Not only must the record support the conclusion that the property is capable of producing a certain amount of material annually, but it also must establish that a market exists for the material. *See United States v. 47.14 Acres of Land, More or Less, supra,* 674 F.2d at 726–27. In the absence of evidence that a market exists, any projection of income becomes little more than speculation and conjecture. *Id.*

There is substantial divergence of opinion between the plaintiff and the defendant as to the projected rate of extraction of sand and gravel from the plaintiff's property. Mr. Mosley estimated that a potential purchaser would seek to extract sand and gravel at a rate in excess of 160,000 tons per year. The defendant's experts, on the other hand, projected a much slower rate of extraction, ranging from 65,000 tons (Donan) to 75,000 tons (Carmichael). Mr. Cranor stated that he based his estimated rate of 70,000 tons per year on a market survey which he had conducted. The record is unclear as to the scope of this survey. Mr. Donan arrived at his projected annual rate of production of 65,000 tons by graphing the plaintiff's sales figures. He plotted a five-year average for the period immediately preceding his appraisal to arrive at a stabilized projected rate of 65,000 tons per year. Mr. Carmichael also grounded his forecast on the plaintiff's past production, basing his conclusion on a letter from the plaintiff's attorney which stated that production would stabilize at 75,000 tons per year.

The plaintiff disputes the defendant's reliance on the plaintiff's production experience in projecting a future rate of extraction. A potential purchaser, the plaintiff asserts, would seek to mine the property at a faster rate than the plaintiff has. In support of this contention, the plaintiff observes that Mr. Crumbo testified that he would seek to extract between 200,000 and

250,000 tons per year from Cloverport's property. Moreover, the plaintiff points to Mr. Bruce's statement that he removed from the property between 175,000 and 267,000 tons of material per year.

The plaintiff, however, has not established to this Court's satisfaction that a market capable of absorbing 160,000 tons per year exists. Mr. Mosley did not conduct a market survey when he projected the capabilities of the property. Mr. Bruce's experience is so far removed in time (1957–1962) and his recollection of his experience with the property has been so dimmed that his testimony is of little help to the Court in deciding on a rate of production. Moreover, although Mr. Crumbo testified that 160,000 tons of material could be extracted from the property, he also stated that it would be extremely difficult to acquire a market for that amount. The record does demonstrate that the plaintiff was faced with competition from larger, more efficient mining operations which were capable of extracting sand in much greater quantities than Cloverport produced. The sand and gravel business is highly competitive, and Mr. Crumbo testified that mining operators jealously guard their markets. Frequently, Mr. Crumbo stated, mining operators are willing to operate at a loss in order to maintain their market share.

The Court is persuaded that the plaintiff's property does have the potential to produce 160,000 tons or more of material per year. The Court is unpersuaded, however, that a market exists for that amount of material. The plaintiff has offered no evidence, other than the conclusory statements of Mr. Bruce and Mr. Wright, which would indicate that such a market exists. On the basis of the record in this case, therefore, this Court is unable to conclude that the plaintiff has met its burden of establishing the existence of a market capable of absorbing 160,000 tons of sand and gravel annually.

Plaintiff's production history should not form the sole basis for the projection of future production. The amount that Cloverport has marketed in the past merely represents a proven minimum market. Although Mr. Crumbo stated that it would be difficult to market 160,000 tons of sand and gravel, he also testified that a small, local operator such as Cloverport enjoys a competitive advantage, within certain limits of distance, over larger businesses. Moreover, the Cloverport property occupies a unique position in that it has access to river (barge), rail and road transport. Accordingly, this Court concludes that a projected rate of production of 100,000 tons per year is reasonable and is supported by the record.

To translate a projected annual rate of production into a stream of income, the Court must determine what a reasonable royalty would have been as of the date of the taking. This Court has adopted the 15 cent per ton royalty rate used by Mr. Carmichael in his capitalization analysis. Mr. Carmichael's use of a 15 cent royalty was the result of his survey of several sand and gravel leases in the Ohio River Valley. Mr. Wright and Mr. Mosley also both testified that in their experience, a reasonable royalty rate would be 15 cents per ton. In rejecting the 10 cent royalty proposed by Mr. Donan and Mr. Cranor, the Court observes that one lease relied upon by Mr. Donan was dated 1964 and provided for an 8 cent royalty. This apparently is one of the leases used by Mr. Carmichael, who stated that "this was from a lease entered into in 1964, and would have to be updated." Mr. Donan apparently failed to do this. The other lease cited by Mr. Donan provides for a 10 cent royalty, and is undated. Mr. Cranor apparently based his 10 cent royalty estimate on the appraiser's "personal knowledge." In sum, this Court adopts Mr. Carmichael's estimates. Mr. Carmichael attempted to adjust the royalty rate for time, and his estimate of 15 cents per ton is corroborated by Mr. Crumbo and Mr. Wright, both of whom have had recent experience in the sand and gravel business.

The projected future stream of income must be discounted to reflect risk and to provide for return of capital investment.

Mr. Mosley stated that the plaintiff's property presents a very low risk in that it has a history of income production and has proven reserves. Accordingly, Mr. Mosley applied a 9.5 percent discount rate. Mr. Donan also used a 9.5 percent discount rate, but testified that he assumed that a purchaser of the property would also purchase the White Stone Company, which absorbed a portion of the plaintiff's production. Mr. Donan stated that in the event a purchaser had no connection with White Stone, he would assign a rate of between 16 and 18 percent. The other appraisal witnesses used similarly high rates: Mr. Cranor applied a rate of 17.5 percent; Mr. Carmichael used a rate of 18 percent; Mr. Mallette testified that as of 1971, investors in mineral properties sought a rate of return of between 20 and 30 percent.

The plaintiff urges that Mr. Mosley's 9.5 percent rate adequately reflects the rather low risk involved. The plaintiff asserts that the property's reserves have been established over a period of 25 years of excavation. The plaintiff also argues that Mr. Crumbo and Mr. Mosley believed that material could be marketed at a rate of 200,-000 tons per year or more. The defendant counters that the sand and gravel business is, in general, a high risk business. Specifically, the defendant contends that Cloverport faces bigger and more efficient competition, fluctuating markets, relatively high freight rates, and uncertainty as to the quantity and quality of reserves.

The discount rate "is an extremely important figure in the computation because a change of even a fraction of one percent will produce a surprising mathematical change in the result." *United States v. Whitehurst, supra*, 337 F.2d at 772. The discount rate that is applied must adequately reflect the risk involved in the contemplated investment. *Id.* While this Court agrees with the plaintiff that the various discount rates applied by the defendant's experts are excessive, the Court

also believes that Mr. Mosley's 9.5 percent rate does not adequately reflect the risks involved in extracting sand and gravel from the plaintiff's property over a 25 to 30 year period. Mr. Mosley's rate does little more than account for deferral of income, with a very small margin added for risk. The plaintiff's discount rate disregards the possibility that competitive forces may over time reduce the market share for material extracted from the property. Moreover, because the plaintiff has not core drilled the property, there is some risk that sand and gravel deposits are not uniform throughout the property.[9]

On the other hand, the defendant's rates are excessive. Mr. Donan stated that a rate of 14 percent to 18 percent denoted a very high risk. Yet, Mr. Donan also testified on cross-examination that there were various positive factors affecting the value of the plaintiff's property, including the fact that the property had been the site of an ongoing business for a number of years. Mr. Donan also testified that, on the basis of Cloverport's excavation history, the property had proven reserves and that a fully informed buyer and seller would consider this in arriving at a valuation. Mr. Cranor also testified that as of 1971, the plaintiff's competitive position was good and its viability as a sand and gravel operation was fixed.

In view of the foregoing and on the basis of the record in this case, this Court has adopted a 12 percent discount rate to be used in calculating before and after values for the plaintiff's property in 1971. This rate adequately reflects the risks that a prospective purchaser would be likely to consider in valuing the property.

In summary, this Court has concluded that before the 1971 rise in the level of the Ohio River, the plaintiff's property contained recoverable reserves of 3,066,000 tons. After the change in the water level, the angle of repose of material located between 358 feet msl and 383 feet msl was

---

**9.** The plaintiff did dig several "test holes" to an asserted depth of 100 feet. The record is unclear as to where these holes were dug and, on

the basis of the record, this Court is unable to conclude that these test holes are equivalent to a comprehensive core sampling of the property.

greatly reduced, resulting in the permanent loss of some 35 percent—or 1,073,100 tons—of the reserves. The plaintiff's property is capable of producing, and the market is capable of absorbing, 100,000 tons per year. Under a royalty leasing arrangement, the owner of the property would expect to receive a royalty of 15 cents per ton for material extracted from the property. Applying a 12 percent discount rate results in a 1971 before-taking value of $121,123 and an after-taking value of $111,933.[10] The plaintiff's property, therefore, suffered a diminution in value of $9,190 as a result of the rise in the level of the Ohio River to 383 feet msl.

### III. Collapse of the Levee

The plaintiff also seeks to recover compensation for the loss of the levee which collapsed into the Ohio River in May 1972. Cloverport attributes the collapse of its levee to the structure's saturation with water after the raising of the pool of the Ohio River in September 1971 followed by the recession of the river to 373 feet msl in May 1972. The defendant opposes any award of compensation for the loss of the levee, asserting that the collapse occurred eight months after the stipulated date of the taking. The defendant asserts further that because the failure of the levee occurred after September 1971, the evaluation date for purposes of this action, the loss of the levee could not conceivably have affected the value of the property.

The levee was in reality a strip of land that Mr. Bruce, and later Mr. Wright, left in place to separate the pit from the river. Mr. Donan testified that the material that composed the levee—overburden, sand and gravel—was unsuitable for the construction of a stable levee, and the structure was doomed to fail ultimately. Mr. Donan also testified that his examination of the property revealed that the plaintiff had excavated the inside bank of the levee at a 35 degree angle. This angle, in Mr. Donan's opinion, was too steep and weakened the structure. Mr. Cranor testified that the

plaintiff had excavated its pit closer and closer to the river, compromising the structural integrity of the levee. At the time of the levee collapsed in May 1972, the width of the levee at the top was approximately 15 feet.

The parties are in agreement that the raising of the water table was a natural and probable consequence of the raising of the normal pool of the Ohio River; liability has been stipulated on that issue. The parties' stipulation, however, does not encompass damages to the property subsequent to the September 1971 date of the rise in the normal pool of the river. Any loss accruing from the collapse of the levee, therefore, would have to arise from the plaintiff's establishing that a second taking had occurred.

A finding of a taking may be supported where a Government activity which is permanent in nature imposes on private property certain recurring consequences which are permanent. *Wilfong v. United States,* 202 Ct.Cl. 616, 622, 480 F.2d 1326, 1329 (1973); *see also Berenholz v. United States,* 1 Cl.Ct. 620, 626 (1982), *aff'd,* 723 F.2d 68 (Fed.Cir.1983). Not all invasions rise to the level of a taking, however. Incidental or consequential damages are not compensable under the fifth amendment. *Berenholz v. United States, supra,* 1 Cl.Ct. at 627. Intent to appropriate may be implied, and it need only be demonstrated that the invasion of property rights resulting from governmental action was a natural and probable consequence of the governmental acts in question. *Id.* at 627.

This Court is unable to conclude that the plaintiff has met its burden of establishing that the collapse of the levee was a natural and probable consequence of actions of the Corps of Engineers. The only evidence that the plaintiff offered which suggests that the collapse may have been caused by governmental action was testimony elicited from Mr. Beatty, a hydraulic engineer who worked with the

---

**10.** In calculating a 1971 value, the Court utilized tables of the American Institute of Real Estate

Appraisers. These tables were admitted into evidence as Joint Exhibit No. 4.

Corps of Engineers. On cross-examination, Mr. Beatty stated that, in his experience, a precipitous drop in the level of a river is capable of pulling away the river banks, especially if the banks are saturated with water. Mr. Beatty also testified that immediately prior to the collapse of the levee, the river had been at flood level. Thereafter, the river began to recede naturally. Under ordinary circumstances, Mr. Beatty testified, the river would have receded to its normal pool of 383 feet msl. The Corps, however, chose to allow the river to continue to fall to 373 feet to facilitate removal of an old dam upstream from Cloverport's property.

The plaintiff has offered no evidence which would establish that the collapse of the levee was due to the Corps' allowing the pool of the river to fall to 373 feet instead of halting the pool at 383 feet. This Court has concluded on the basis of its examination of the record in this case that the levee was an unstable structure which was composed of materials unsuitable for the construction of a levee. Moreover, the levee was weakened by the plaintiff's excavation of its pit. The collapse was induced more by the occurrence of a random natural event—the recession of flood waters on the Ohio River—than by any act of the Government. There can be no recovery for a taking in such circumstances, even if there is permanent damage to the property which is partially attributable to governmental activity. See id. at 626.

Even if this Court were to conclude that the loss of the plaintiff's levee is compensable under the fifth amendment, the record is deficient in establishing the amount of compensation to which the plaintiff would be entitled. The only evidence the plaintiff offered on the amount of compensation was the 1971 replacement cost. As has been noted previously, the measure of compensation to be awarded in the case of a partial taking is the diminution in value of the remainder not taken. The plaintiff offered no evidence on the issue of the value of its property without the levee.

Accordingly, the plaintiff is not entitled to receive compensation for the loss of the levee. Although the Government's actions caused a saturation of the structure, its collapse was due to a natural event: the recession of the river from flood stage.

IV. The Railroad Spur Track

■ The plaintiff also seeks to recover as compensation the value of its railroad spur track, which has not been used since 1973. The loss of the track, the plaintiff asserts, is due to its inability to extract sand from its property in sufficient quantities to serve customers by rail. This Court has considered the plaintiff's claim and has concluded that it is wholly unsubstantiated and must be rejected as a claim for damage to the plaintiff's business.

Throughout this case, the plaintiff has persisted in claiming an entitlement to receive compensation for damage to its business operations. This is particularly true in the case of its claim for the "loss" of the railroad spur track. In pressing its claim, the plaintiff has totally disregarded the "before and after" standard of valuation this Court must apply in measuring the diminution in the value of the plaintiff's property. At no time did the plaintiff offer evidence to demonstrate that its purported inability to utilize the spur track diminished the price that a willing purchaser would pay for the property. Rather the plaintiff has asserted a claim for the net cost of the track itself. Such a "value to me" standard is clearly impermissible. United States v. Sowards, supra, 370 F.2d at 92.

The record in this case clearly supports the conclusion that the plaintiff's asserted inability to use its rail spur to ship sand is due to market factors totally unconnected with the rise in the water level of the Ohio River. Mr. Chester Crumbo testified that his employer, the E.T. Slider Co., had in the past shipped substantial quantities of sand and gravel by rail. In the 1970's, however, rail freight rates began to escalate rapidly. Eventually, Mr. Crumbo testified, freight rates became so prohibitively and disporportionately high in relation to the cost of sand and gravel that rail transport no long-

er was a viable method of transportation in the industry.

Plaintiff's claim for the purported loss of its spur track is, in reality, a claim for incidental damage to the plaintiff's business. Further, the record does not establish that the plaintiff's asserted inability to make use of the track has diminished the value of the property as a whole. In sum, the plaintiff may not recover for the "loss" of the railroad spur track.

## V. Summation

 On the basis of the entire record, this Court has concluded that the plaintiff's property was diminished in value by $9,190 as a result of the rise in the level of the Ohio River in September 1971. The plaintiff is also entitled to receive interest as part of the just compensation on this amount from the date of the taking until the date of payment by the defendant. The date of taking in this case is September 5, 1971. This Court's predecessor court, the United States Court of Claims, adopted a 7.5 percent rate of interest for the period of 1971 through 1975, *Miller v. United States*, 223 Ct.Cl. 352, 406, 620 F.2d 812, 841 (1980), and an 8.5 percent rate for the period 1976 through 1979. *Id.* In *Foster v. United States*, 3 Cl.Ct. 738 (1983) (*Foster III*), Judge Harkins observed that the Contract Disputes Act provides for the payment of interest on successful contract claims at a rate to be established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41, 85 Stat. 97. *Id.* at 745; *see* 41 U.S.C. § 611 (1982); *see also Jones v. United States*, 3 Cl.Ct. 4, 7 (1983). These rates are:

| | |
|---|---|
| Jan.—June 1980 | 12¼ percent |
| July—Dec. 1980 | 10½ percent |
| Jan.—June 1981 | 14⅝ percent |
| July—Dec. 1981 | 14⅞ percent |
| Jan.—June 1982 | 14¾ percent |
| July—Dec. 1982 | 15½ percent |
| Jan.—June 1983 | 11¼ percent |
| July—Dec. 1983 | 11½ percent |
| Jan.—June 1984 | 12⅜ percent |
| July—Dec. 1984 | 14⅜ percent |

Judge Harkins determined that "[f]or purposes of uniformity in compensation of claims against the Government, flexibility in administration, notice to the public, and judicial efficiency, rates established under the method required in the Contract Disputes Act are * * * appropriate for computation of just compensation in this taking case * * *." 3 Cl.Ct. at 745. This Court agrees that a uniform method of establishing interest rates is preferable to an ad hoc, case-by-case evaluation. The Court therefore adopts Judge Harkins' reasoning and interest computation methods. Accordingly, for the period from January 1, 1980 to the date of payment, interest shall be computed by the Secretary of the Treasury pursuant to the procedures established by Pub.L. No. 95–41, 85 Stat. 97.

The plaintiff also seeks to recover attorney's fees and expenses incurred in prosecuting this action. To the extent that the plaintiff wishes to continue its pursuit of attorney's fees and expenses, it shall file an application for its litigation fees and expenses not later than 30 days after the date of this opinion. The plaintiff's application shall be supported with itemized documents detailing the man-hours devoted to this case, standard hourly billing rates of all individuals who worked on the case, any amounts paid to experts and any other expenses for which reimbursement is claimed. The defendant shall file its response within 30 days of the filing date of the plaintiff's application. The plaintiff's reply to the defendant's response shall be filed not later than 14 days after the date of filing of the defendant's response.

## CONCLUSION

The plaintiff is entitled to recover $9,190 as compensation for the partial taking of its property on September 5, 1971. The plaintiff also is entitled to receive simple interest on that amount at a rate of 7.5 percent per annum from September 5, 1971 through December 31, 1975 and at a rate of 8.5 percent per annum from January 1, 1976 through December 31, 1979. For the period from January 1, 1980 until the date of payment by the Government, interest shall be calculated by the Secretary of the

Treasury in accordance with the method established by Pub.L. No. 92–41. The plaintiff's application for attorney's fees and expenses will be considered after all supporting documents have been filed with the Court. Upon a determination of the plaintiff's attorney's fees and expenses, judgment will be entered as provided above.